The first case is Best Medical International, 21-2084. Mr. Coyne, when you're ready. Thank you, Your Honors. The main flaw, I think, in this particular Interparties Review petition was that the panel of the Patent Trial and Appeal Board determined that the level of ordinary skill and art required two years of programming experience. That was a reversal from what the Board had indicated in its institution decision, which didn't include that requirement of the person of ordinary skill and the art. Counsel, that's a factual question, right? The level of person of ordinary skill and the art and determination of that is a factual inquiry, right? That's correct. And I was thinking about this issue a lot. And I was thinking, what sort of factors do courts take into account when they're trying to determine what the person of ordinary skill and the art is? And I found some cases on it that list some factors. They include things like, what is the skill level of the inventor? What is the skill level that you see displayed in the prior art? There's many factors, actually. But I don't see those necessarily discussed in the briefs, nor do I see any evidence submitted by your client on those factors. So I'm wondering, what evidence did you rely on to show what the level of ordinary skill and the art is? Well, I mean, that testimony came from the, well, number one, from what's disclosed in the patents themselves, excuse me, the patent itself. I said patents just because the next appeal also deals with kind of the same issue. But in the patent itself, in terms of what it discloses, what it's talking about, in terms of what the technology issue is. And so it's a method of determining optimization. It's a method of determining kilometer angles. And we are to look at the claims also when we look at what the invention is directed to, right? That's correct. And so looking at those, so that provides, you know, one part of the analysis in terms of what a person born with a skill in the art need to know. And about things like the other factors are sophistication of the technology, education level of active workers in the field, types of problems encountered in the art, educational level of the inventor, rapidity with which innovations are made. Those are some of the factors that are precedents that should be considered. Was any evidence introduced on those factors? Yes, Your Honor, that was going to get to you. Our expert witness, Mr. Chase, did introduce some of that evidence in terms of what, under his definition, what a person born with a skill in the art would be. Where did he talk about the education level of the inventor, types of problems encountered, those kinds of things? Where did he talk about it? Yeah. I don't have a specific site to his declaration. His testimony was based on, from his perspective, of a person born with a skill in the art who had clinical experience, who actually used these systems. And his testimony was that the vast majority of people who worked in actually implementing these optimization programs, that they would have a master's or a Ph.D. in radiation or nuclear medicine or something along that line, but wouldn't necessarily have the experience of a programmer. With all due respect, it sounds a little conclusory and like, you know, this is my view, but is there any evidence or even input on any of these factors that I mentioned, other factors, other than the specification and the claims? I think generally no. Generally it's the testimony of the experts. Okay. That in terms of what someone working in this field would be doing. There's the patent itself in terms of what the claims say and what the specification says, but in terms of what the level of skill the inventors was, I don't think there was evidence necessarily presented on that latter part. Mr. Coyne, excuse me. I know you're focusing on the computer programming part of this, but the board considered Dr. Chase's testimony and rejected it for a number of reasons, independent of his lack of computer coding experience, most clearly because the board took judicial notice, as I understand it, of Dr. Chase's statement that he was not an expert in the design of treatment planning systems. So, I mean, even if we give your argument about computer programming some credit and some merit, nonetheless, it seems to me that the board didn't completely discount his testimony and simply weighed it in light of what was clearly the extent of his expertise. What's wrong with that? Well, Your Honor, you're correct. The PTAB did not completely discount his testimony. They actually considered him to be an expert who's qualified to talk about these references that were part of the analysis. And so in many instances they did rely on him, they did cite him during the opinion, but it was in particular instances, and it mainly in terms of the motivation to mine the references and then also in the reasonable expectation of success, where that is where basically the PTAB disregarded his testimony because of which you indicated that he said he was not an expert in design, in basically manufacturing the systems. His expertise was in using them, putting them together. But the board also found that he has a master's degree in physics, in nuclear medicine. He worked, he did hundreds of these procedures over time. So he was well aware of what goes into doing these procedures. He, you know, as one in that field, he keeps up on papers and the technology that goes on in that field. And so his perspective was that he can understand what these references, so the four references that make up the obviousness argument for each of the claims, the combination. He understood, and I don't think there's any dispute, that he could understand those references. He understood what the combination alleged to be for obviousness was. And it was his testimony that, you know, that from a mathematical standpoint, that one, that he understood what the combinations were, but that no one would, one skilled in the art, who knew these references, was familiar with the technology, would not have actually combined these references together. But the board considered all of the references and they considered the testimony of the other expert and weighed and balanced all of that and came up with the conclusion that there was, in fact, a reasonable expectation of success. You know, substantial evidence is the standard of review, and that's, I think, a pretty difficult hurdle for you. I understand, Your Honor, and I think, you know, and I agree that PTAB did, in fact, you know, look at the evidence. But I think if you look at just the face of some of the evidence that was put together, and again, this was four different references, really, in effect, to deal with one particular clause of the claims. And that was, you know, to enhance delivery efficiency by reducing a number of radiation beam segments and reducing the number of radiation beam monitoring units. And the problem that the PTAB has in terms of the arguments, in our view, is that the references cited don't actually disclose delivery efficiency or reducing it in terms of radiation beam segments and the number of radiation beam monitoring units. So, for example, Otto, which is one of the references, it talks about doubling the number of beam segments during optimization. So, in our view, that actually, you know, teaches away from delivery efficiency. So combining that with the other references to try to come up with a system that enhances delivery efficiency just doesn't make sense in terms of what Otto itself discloses. The Chang reference, it discloses delivery efficiency in terms of not being rotated between segments in a step-and-shoot delivery system. So, basically, it's a totally different system than the computer-implemented method of determined kilometer angle that is part of Claim 1 and the other claims it issued. Mohan, which is one of the other references in this group of four references that are put together to try to obviate the patent claims, it, again, in our view, teaches away from delivery efficiency, enhancing it. You know, it just includes a quote, and this is an A590, where orientations with minimized fluctuations is possible but not trivial. In our view, that basically says that, you know, it's not a trivial problem to combine these things, and minimizing fluctuations was kind of a stand-in for delivery efficiency in terms of Mohan, at least according to the petitioners. That statement by Mohan, and then the fact that Mohan itself doesn't actually refer to segments, and makes no mention of the delivery efficiency, but it's focused on reducing leakage of unannulated tissue by minimizing fluctuations. Counselor? Yes. I don't recall teaching away being a specific ground that was argued in the brief. I don't think. Maybe I've got the two appeals you have confused, but is it in there? Where would I find it? I believe it's in the reply brief, and that would be… But is it in your opening brief? I don't know if the words teaching away was in the opening brief, but the argument was that argument, basically, that these references do not disclose what is in… It does not disclose what is claimed in the claims, and therefore it doesn't disclose… Since it discloses something that's not in the claims, it doesn't disclose what's in the claims. It doesn't provide the teachings necessary to combine these references as they allegedly combined. Mr. Coyne, you're into your title now. Thank you all. Thank you. Good morning. Ms. Frazier, excuse me, before you begin, let me ask the courtroom deputy to please turn up the volume on the judges' microphones, if that's possible, please. Sorry for that. When you're ready. Thank you. So, Your Honors, let me, I guess, first just remind us all that the patented invention here is about a system and a method for radiation therapy treatment planning, which is a very sophisticated field, and it's about optimizing the rotation of a collimator angle, optimization with a cost function, and a cost function that has two parts, one optimizing conformality, the other optimizing efficiency. How does that support your view that the board was correct in its definition of the POSA? Well, that's a very good question. The fact that the field is sophisticated is one of the factors that are considered for defining the level of the POSITA or POSA. But what exactly does that have to do with computer skill? One could argue, I think, they take the position that computer programming is just reducing invention practice and that a person of ordinary skill does not have to have that computer programming knowledge. Well, I think that the patent, first of all, demonstrates otherwise, and that's nicely reflected in the PTAS decision, and they cite numerous points where the patent explains that optimization is a computer-implemented method, fundamentally can't be done in your head, and that it's also something that involves sophisticated systems, computerized systems. The claims also specify it's computer-implemented, and it includes a computer for implementation. On the issue of the POSA, though, I would also point out that there is additional evidence in the record, and that was discussed in the response brief, and that includes the prior art references, which also indicate some of the points I just made, and also the experts. Their CVs are included in the record, and you can see just how sophisticated they are from the CVs, and the educational level quite high. I will address, then, I guess, a couple of other points that were made. Mr. Coyne indicated that Best Medical's expert understood the prior art references, but I'd suggest that understanding the prior art is very different than understanding the field and having the level of skill to both implement it and to understand what that level of creativity is of the ordinary person of skill, and that level of ordinary creativity is very important. Under KSR, we've been instructed to consider the prior art through the lens of the POSA, and to understand how the POSA would understand those disclosures. The fact that one of these references does not use the words delivery efficiency is simply neither here nor there, because when you look at that reference through the lens of a POSA, a highly educated person that understands all of these factors in radiation therapy, it's very clear that, in fact, it is directed to efficiency. It's about reducing the time it takes to deliver a treatment, a specific treatment. That's efficiency. Again, this is explained, I think, in the briefs nicely. On the point of the disclosure of the references, again, the references need to be considered together, and the board here carefully, carefully explained what each reference explains, why it's important, and how it fits together. I'm happy to reiterate that, but I think it's in the record. Each of these references, though, is about optimizing collimator angles. They're all directed to the very fundamental problem at issue here, and each of them teaches an aspect that nicely complements another. They fit together, and if you look at them together, they do disclose all of the elements, all of the limitations of the claims. The fact that one reference may have actually implemented an optimization routine in a step-and-shoot type of planning... Is that an auto-reference? So, the auto-reference actually describes both. The Chang reference also describes both, both being step-and-shoot and dynamic. And the fundamental difference is whether or not you're leaving the beam on while you're changing the window of your collimator. And it's much simpler. Think about it. If you turn the beam off, set your new collimator angle, shoot radiation, turn the beam off, get your other collimator angle, shoot the radiation. But you don't have to. You can leave the beam on, and you just have to be a little more cognizant of the transitions between those windows. And so, the dynamic process is really just a more challenging process. But the expert testimony here explains that one of skill would understand the differences, and the same principles apply. They're both about multi-leaf collimators, rotating them to form a beam that treats radiation. And so, that's really a distinction that's not relevant for the problem here. The teaching away point, possible but not trivial? Well, you can read it. I think that the interpretation of a reference, though, again, needs to be viewed through the lens of Posa. And importantly, Mohan actually did it. Mohan didn't just say it's possible but not trivial. Mohan actually did it. If that's not a disclosure, I'm not sure what is. The fact that it may be difficult, especially in a sophisticated field like this, is not a teaching away. There's nothing in the other references to suggest that you could not do it. There's no discrediting of that. So, there is no teaching away here. And if there are no questions, one other point I wanted to raise, which relates to enablement here. In the reply brief, it was suggested that the level of skill for enablement is different than the level of skill for obviousness. I do not believe that is true. There is no citation to suggest that is true, not aware of any case law to that effect. The test is certainly different. The statute is certainly different. And the language that's used in those two statutes is different. So, in 103, there's a reference to ordinary skill in the art. And in section 112, there's a reference to a person of skill. And we can talk about whether or not 103 refers to the hypothetical person and 112 is a real person. But the case law actually demonstrates that the level of skill, in fact, just the skill, what is the skill? Is the skill computer programming or is the skill not computer programming? That's the same question for enablement and obviousness. And you can actually see that in… Let me see. Yes, you can actually see that demonstrated in the… Oops, let me find it. Mm-hmm. Well, I've lost the reference here. In any event, one of the cases that is cited relating to enablement discusses the level of skill and refers to ordinary skill with respect to an enablement assessment. So, there is really no difference there. The reason that's important, the reason that's important is because there's a little bit of a squeeze argument here, as the Europeans would say. If the patent is to be enabled, and it does not describe anything about computer programming or optimization methods and how you do that, if it's to be enabled, then that has to be within the skill of the person of ordinary skill. And if it's not, then it's not enabled. And as you said before, you're not aware of any cases in which our court has given a different definition for a person of ordinary skill in the art for different statutory provisions. Correct. So, different test. So, the test is whether or not one of skill can actually practice the invention without undue experimentation. That's the question of whether or not a person of skill can read the patent and understand how to do it. That's different than the question of whether or not the person of ordinary skill, looking at the prior art, given that person's creativity and knowledge, would come to see the invention. And it's important to cap that level because, of course, that level affects, I think, the determination of obviousness. Questions? If you have nothing further, I think we have your argument. Okay. Thank you. I guess I forgot to say the most important thing, if I may, that we do believe there's substantial evidence to support the evidentiary findings here and that the board provided a very reasoned explanation as it was bound to do.  Thank you. Just in rebuttal. So, it's not just delivery efficiency. It's a specific claim of delivery efficiency. So, even if the references may somehow be taken to deal with delivery efficiency, what the claim language requires is enhanced delivery efficiency by reducing a number of radiation beam segments, reducing a number of radiation beam monitor units. And that's what the references, Otto Chang, Mohan, that's what they lack. They don't reduce efficiency... Excuse me, enhance delivery efficiency by reducing radiation beam segments and reducing a number of radiation beam monitor units. That is the issue in terms of why those references don't really anticipate or obviate the claims. And then in terms of the enabling argument, obviously that was one that was not before the board. It wasn't part of the briefing before the board. It's not an issue that really should be taken up or is allowed to be taken up in an enterprise pre-proceeding. And I understand it's in response to the argument that the appellant has made, the best medical has made, that you don't need to have programming experience to understand these references. And in regard to that, I mean, there's nothing in the claims, there's nothing in the patent that talks about programming, coding, or the like. That's because the issue here is not programming. The intervention is not programming. We're not doing a special-purpose computer with kind of special programming. What we have here is we have mathematical equations, and that's what's disclosed in the prior art. What about the fact that the claims refer to computer implemented in several limitations? Your view, I guess, is that that doesn't require coding. Yes, our view is it doesn't require coding because what the essence of the claim is, even though it's computer implemented, it's the mathematics behind it. It's the equations being used, how cost functions are being put together, and the combination of those cost functions and how the mathematics works. So the focus on the claim isn't on programming. It's on the mathematics and the physics of the cost functions and how you enhance efficiency by reducing beam segments, reducing the number of rates and beam monitor units. That doesn't take programming experience, and that's why we believe that discounting Mr. Chase's testimony because he either didn't have programming experience or because he didn't have commercial experience, which in the commercial experience wasn't part of the personal mission of taking that position. So thank you, Your Honor. Thank you. The case is submitted.